WILKERSON, *Appellant*, v. THOMPSON.

| 82 | 317 |
|----|-----|
| 97 | 603 |
| 82 | 317 |
| 108 | 61 |
| 82 | 317 |
| 111 | 392 |
| 82 | 317 |
| 114 | 325 |
| 82 | 317 |
| 120 | 559 |
| 82 | 317 |
| 133 | 22 |
| 82 | 317 |
| 86a | 81 |

1. **Instructions**: ASSUMING FACTS. An instruction which assumes the truth of a controverted fact in issue, should not be given.

2. **Possession, Friendly, Adverse**: BURDEN OF PROOF. Where one who is in possession of land is present at its sale by another, and makes no claim to it, such possession, continued after the sale, will be deemed to be subordinate and friendly to the purchaser, and cannot be changed into an adverse holding so as to permit the running of the bar of the statute of limitations, until a knowledge of its adverse character is brought home to the purchaser, and the burden of showing such change and knowledge is on the party so claiming adverse possession.

*Appeal from Putnam Circuit Court.*—HON. JOHN W. HENRY, Judge.

REVERSED.

*A. W. Mullins* for appellant.

*C. A. Winslow* for respondent.

Neither party having shown a paper or other legal

title to the land, and the defendant being admitted to have the prior possession, the right is presumptively with him. Prior possession is evidence of the better right as against a party not showing title, or a right to the possession. *Crockett v. Morrison*, 11 Mo. 3; *Dale v. Faivre*, 43 Mo. 556; *Bledsoe v. Sims*, 53 Mo. 305; *Norfleet v. Russell*, 64 Mo. 176. The two instructions given for plaintiff, submitted the facts on which he relied in the most favorable light. Plaintiff seeks to recover on the strength of an estoppel *in pais;* such estoppel will not support ejectment. *Allen v. Sales*, 56 Mo. 28. The court properly declared the law on the question of limitation. The land being military bounty land, the limitation of two years applies. Forcible entry will not interrupt the statute of limitations. *Ferguson v. Bartholomew*, 67 Mo. 212.

RAY, J.—This is an action of ejectment for the northeast quarter of section 14, township 58, range 21, in Linn county, Missouri. Suit was commenced in the Linn circuit court on May 12, 1871. The petition is in the usual form. The answer a general denial. A change of venue was afterward awarded to the Putnam circuit court, where the cause was tried by a jury, resulting in a verdict for the defendant, and judgment accordingly, from which the plaintiff has appealed to this court.

On the trial neither plaintiff nor defendant offered any paper title to the land in controversy. The plaintiff, however, in support of the issues on his side, offered evidence tending to show, that, on the 19th of March, 1869, the defendant and his son, Silas F. Thompson, were living together in a cabin, situated on the land in controversy, and surrounded by a field or enclosure of some ten acres, or more, which the son claimed to own. A part of the inclosure seems to have been on the northwest quarter of said section, and the balance with the house on the land in controversy. The plaintiff's evidence further tended to show that the house was first built on the northwest quarter of

said section, in 1864 and afterwards, in about 1865 or 1866, moved upon the northeast quarter, or the land in suit; that the defendant thought and claimed, that the house and improvements were situated on the northwest quarter, and some of the witnesses said that neither the defendant or his son Silas ever claimed to own, or possess the northeast quarter, until after this fuss or controversy sprang up. It appears that the wife of defendant died, about 1865, and that the son married about that time and brought his wife there, and that after that they both lived in and occupied the house, and worked upon and cultivated the farm together. It, also, appeared that when the house and inclosure were first built, the line between the northeast quarter and northwest quarter had not been run, and that when the line was afterwards run, it then appeared that the house was near the dividing line but on the northeast quarter with a part of the inclosure, and that the defendant claimed that the surveyor was running the line too far west on him.

On the part of the defendant the evidence tended to show, that the first improvement on the land in controversy was made by the defendant, James N. Thompson, in 1861; that the improvements consisted of a small house, a cabin, with fencing around it, and was claimed and occupied by the defendant; that some five or six acres were fenced in 1865, 1866 or 1867; that the old man built the fence; that he made the rails and has lived there most, if not all, the time since; that the old man first commenced on the land in 1861; that Silas, his son, was a boy and came with his father; that they settled on the northeast quarter first; that he built the house first on his land, and then moved it out; that the old man claimed to own and to be upon the northwest quarter and did not claim to own the northeast quarter; that the old man and Silas cultivated the field in 1869, and planted a crop in the spring of 1870; that Silas married some time about 1862 or 1863; that Silas lived sometimes at home, and sometimes at other places;

that the old man kept house for himself, while Silas and his wife were not living with him, and continued to reside at the same place, while Silas and his wife were residing elsewhere; while Silas lived there his wife did the house work and Silas worked on the farm, etc.

The plaintiff was also sworn as a witness in his own behalf and testified as follows: "About the 19th of March, 1869, the day before the lease was made, I went to where this land was and saw Silas F. Thompson, and the defendant here, chopping close to this land, but on the northwest quarter. I asked Silas who the improvements on the northeast quarter belonged to and he said they belonged to him; I then asked him what he would take for the possession and improvements, and he said $200, if I would let him move the cabin off; Silas then said he would see the old man ; if he concluded to take the $200, would come to town next day. Silas and I then agreed that I would consult Judge Brownlee, and that he should come to Linneus next day and I would tell him what I would do ; Silas came to town next day, and when I saw him he asked me what I had concluded to do, and I told him that we could trade ; I gave him my note for $200, due the next Christmas, and he made the first lease ; old man Thompson, the defendant, was present during all the talk Silas and I had down where they were chopping ; he did not inform or intimate to me that he held or claimed either the possession or improvements; the only thing he said was to Silas, that he had better not trade ; he heard all that passed between Silas and me about the matter there. After the note was due and I had paid it, Silas told me that the old man was setting up some claim. I did not know that the defendant made any claim to the possession or improvements. I had bought stock from the place several times, and always traded with Silas, and never heard any objection from the defendant. I never had any conversation with the defendant about it ; he was not present when the note was executed or lease taken by Silas.

The plaintiff next offered and read in evidence the following leases, to-wit:

"Know all men by these presents that I, Joel H. Wilkerson, have rented and leased to Silas F. Thompson, the northeast quarter of section fourteen (14), township fifty-eight (58), range twenty-one (21), from this date until the 25th day of December, 1870; said Thompson is to continue in the possession from this date, and is to pay rent at the rate of $5 per annum, and to hold possession of said land to said Wilkerson, to preserve the timber on the land, to cut no timber nor take any off the land, and agrees to give up the possession to said Wilkerson at any time he may demand the same, during the said time herein described, reserving the part on which any crop may be growing until the end of the term and to give possession of all the land at the end of his time without notice. Signed this 21st day of April, 1870.

Silas F. Thompson, [seal.]

"Know all men by these presents that I, Joel H. Wilkerson, have rented and leased to Silas Thompson the northeast quarter of section fourteen (14), in township fifty-eight (58), in range twenty-one (21), for the term of one year from the date of this lease; said Thompson is to have possession immediately, and is to pay rent for the use of the same at the rate of $5 per annum; said Thompson agrees to hold possession of said land to said Wilkerson, to preserve the timber on the land, to cut no timber nor take any off the land, agrees to give up the possession to said Wilkerson at any time he may demand the same during the said time herein leased, reserving the part on which any crop may be growing until the end of the year, and to give full possession of all the land at the end of the year without notice. Signed this 20th of March, 1869.

Silas F. Thompson."

By agreement between the undersigned the within

lease is hereby extended for the term of thirty (30) days, March 21st, 1870.

J. H. WILKERSON,

SILAS F. THOMPSON.

The plaintiff also introduced A. D. Christy, who testified as follows, to-wit:

"Was present when the line between the northwest quarter and the northeast quarter, 14, 58, 21, was run, surveyed in 1866 or 1867; the defendant was present and said the corner between the two tracts of land was too far south. Wilkerson paid me $200 on a note given by him to Silas F. Thompson; the note was paid about the 25th of December, 1869."

On cross-examination the said witness stated: "Three or four acres of the improvement by that survey were on the northeast quarter, 14, 58 21, and the house in which the Thompsons resided was on the northeast quarter, and part of three strings of fence enclosing in part the three or four acres."

The defendant was also sworn as a witness in his own behalf, and testified as follows, to-wit: "Know this land since 1860; took possession of both quarters in 1860. In 1869 I had ten acres improved. I built on the northeast quarter first in 1860; moved the house in July, 1866, further out on the same quarter; I remained on the land since I first built there; Wilkerson came to Silas and myself when we were at work. Wilkerson, Silas, what do you say to signing a lease to the land inside the field; said he would put $5 in the lease, but did not care whether it was paid or not. I asked Wilkerson if he had the old patent on the land, and he said yes, and pulled out a paper which was bogus. I know a good title when I see it; President Monroe never signed that paper. I then said to Silas, 'keep your hands out of it, sir.' The improvements on the land were worth $400 or $500 when Silas traded with Wilkerson. I made the improvements on this land myself,

and have held and occupied the same ever since for myself and for nobody else. I never received any part of the money that Wilkerson paid to Silas Thompson, and knew nothing about either the note or the lease, no party thereto. Silas did not sell the improvements with my consent. Silas moved off of the land in 1864, and was gone about two years, and came back with his family and lived with me. I lived on the place all the time and kept my stock and effects all the time, and live there now. I had eight or ten head of cattle most of the time, and about thirty head of hogs. Silas worked at making the improvements with me."

The plaintiff here admitted that the land sued for was military bounty land of the war of 1812, patented by the United States to the soldiers in 1819.

The defendant, also, offered his son, Silas F. Thompson, as a witness in his behalf, who testified as follows, to-wit: " My name is Silas F. Thompson, age is 32 years, my residence is Linn county, Mo.; I have been acquainted with the tract of land in controversy since 1864; I don't know when I first saw the place that any improvements were on it; the first improvements that I know of were made in 1866; the old man and I made the improvements; my mother died in the year 1864, in July or August; my father was living at that time in the bottom; I do not remember upon which quarter; the house was moved on this land by my father in the year 1866; it was a log cabin about 14 by 16; it was used for a dwelling by my father and myself; after it was moved it was rebuilt; after I moved there, my father has continued to live there on the same tract ever since from 1866 till 1870; I lived there in the spring of 1870; I moved to Eusly Ralph's place, about 100 yards from this place; I moved back in February, 1872; I think during my absence the old man resided upon this same tract; I remained there after moving back from Yellow Creek about one year; I went upon this quarter section in 1866; there have been a couple acres about the house and

about the same number down the west line fenced in; while I was on Yellow Creek the old man cultivated the land about the house; I think there was no arrangements between my father and myself, except that he wanted me to come and live with him; the improvements which were made after I went there were made partly by myself and a young man by the name of Johnson, and the old man; I think the trade between Mr. Wilkerson and myself was made in March, 1869. I signed a lease at that time for the tract of land in controversy; I was in Linneus when I signed the lease; my father was at home when I signed the lease; my father was present at the conversation between Mr. Wilkerson and myself; Mr. Wilkerson wanted to rent the land but I would not lease it unless he would consent to give me $200; he told me to come up and we would fix it up; the old man did not say much of anything; I think he did suggest that I had better not trade; I got Mr. Wilkerson's note for the $200 which I traded for a piece of land; the note was made payable to me; my father never received any of the purchase money; he had nothing to do with making either the trade or the lease; Mr. Wilkerson agreed that at the end of the year I could take off the house; the trade mostly closed at his visit to me; he said he would see Brownlee, and if he would agree to the trade it would be all right; the old man was living from town at that time about two miles; I think Brownlee drew up the lease; I moved off the place about a year and one month after the lease was made; after I left the old man lived on the same quarter of land and has been living there ever since the new house was built, in March, 1872; I think it is 18 by 16, one story and a half high and is a frame; I think I hauled one or two loads of lumber from the mill for my father before I came back; the house is on the north-east quarter, about four rods from the east line, and may be a little over twenty rods from the north line."

Cross-examined: "When the trade was made between myself and Mr. Wilkerson, I was on southeast section 14,

close to this land; it was not more than two days after that I came up to make the lease; I started up to make the lease in the morning; my father was at home at this time; I do not remember whether he knew why I was going to town or not; Mr. Wilkerson gave me his note for two hundred dollars; it was due a Christmas day of the December following; I retained possession of it until about due, and then traded it to A. D. Christy; my father knew that I had the note; he knew what it was given for; Mr. Wilkerson gave me permission to remove the house and the rails; my recollection was that I was to have the privilege of removing all the improvements; I think the lease was renewed after it first expired, I believe for about one month, and at the expiration of that mon'h I think I made a new lease from the end of that month, until the 25th of December or New Year; I was not living on the land at the time of the second lease, though the old man and myself did put in a crop of corn in the spring 1870; I did not finish the cultivation of the crop because the old man objected to me working it; there was no difficulty about it except that he did not want me to work there unless I would do as he said; there was no difficulty between us about my having made the lease. My family was the first to occupy the house built on this land in 1866; I do not know of any other family having occupied it since I left it; I did not help build the new house; I only hauled two or three loads after I came back; my father and myself were at work chopping some poles when Mr. Wilkerson come down to make the trade; all the conversations that passed between Mr. Wilkerson and myself was while my father was present, and when I came up we had no other conversation, except Mr. Wilkerson said that he would do that; and he made the note and I signed the lease; I quit cultivating the crop in 1870, because I considered the locality unhealthy, having lost my little girl there, but part of the difficulty was that my father wanted me to let him have $80 to put into a silver mine and I only let him have $40; the old man did not ask

me for a cent of the money I got for the land; I think my
father wanted me to give him the $80; he did not say
whether he wanted it as a loan or as a gift; in 1869 and
1870, my father had no family; in 1869 I had a wife and
two children; I did the general trading and management
for the farm while my father and I lived together, and my
wife had control of the household matters; we worked to-
gether and all we made was common to both, and all the
provisions for the family were either obtained from the
farm or by the sale of produce from the farm."

Re-examined: " When I was away I supposed the
old man done his own trading; when I was living with
him we worked together, and all was put in after I went
there except about one acre around the house. The note
given me was to secure the possession of the northeast
quarter; I did not give possession at the time of the trade
because I had no house to go into; I do not think I ever
paid any rent; do not think Mr. Wilkerson ever asked me
for any."

At the close of the testimony, the court gave the fol-
lowing instructions for the plaintiff, to which defendant
excepted:

1. If the jury believe from the evidence that in the
month of March, 1869, and prior thereto, one Silas F.
Thompson was in the possession of the northeast quarter
of section 14, township 58, range 21, in Linn county, Mis-
souri, and that in the said month the said Silas sold to
plaintiff the improvements and possession thereof, repre-
senting himself as the owner thereof, and that the plaintiff
relying upon such representations, and having no means of
knowing them to be false, paid the said Silas $200 for said
improvements and possession, and that the defendant, James
N. Thompson, was present during the negotiations for said
sale, and knew of the same, and did not disclose to the
plaintiff at the time any claim to the land or the possession
thereof, (and that the said Silas, during a part of the year
1869 and 1870, occupied said lands, or any part thereof

under the leases which have been read in evidence) (Marked on margin "not asked")—the jury should find for the plaintiff.

2. If the jury believe from the evidence that in the month of March, 1869, and prior thereto, one Silas F. Thompson was in possession of the northeast quarter of section 14, township 58, range 21, in Linn county, Missouri, and that in the said month the said Silas sold to plaintiff the improvements and possession thereon, representing himself as the owner thereof, and that the plaintiff relying upon such representations, and having no means of knowing them to be false, paid the said Silas $200 for said improvements and possessions, and that the defendant, James N. Thompson, was present during the negotiations for said sale and knew of the same, and heard offer to purchase and said Silas to sell same and did not disclose to the plaintiff at the time any claim to the land or the possession thereof, then the law precludes the said James N. Thompson from now setting up any claim or title to said lands or the possession thereof which he then had or now claims to have then had.

The court then gave the following instructions for the defendant, to which the plaintiff excepted.

6. Although the jury may believe from the evidence that Silas F. Thompson took the leases from plaintiff, which have been read in evidence, yet if they further believe that defendant was not a party to either of said leases, and that he remained in the actual possession of said premises from the time of the sale from Silas to Wilkerson, claiming the premises as his own, then the fact that Silas F. Thompson took the leases from Wilkerson, did not stop or prevent the statute of limitation running in favor of defendant.

7. Although the jury may believe from the evidence that Silas F. Thompson sold plaintiff, with the consent of the defendant, the possession and improvements of and on the premises here sued for, on or about the 20th day of March, 1869, yet if they further believe from the evidence

that defendant, from and after that date, continued in the actual, open, notorious and continued possession of said premises for two years or more, before the 12th day of May, 1871, claiming the same as his own, and adversely to the plaintiff, they are bound to find for defendant.

The court then also gave the following instructions for the plaintiff: "If the jury believe from the evidence that Silas F. Thompson was in the possession of the land sued for under the lease read in evidence, within two years before the 12th day of May, 1871, then plaintiff's right of action is not barred by the statute of limitation, as set forth in the instructions for defendant."

To the giving of which defendant at the time excepted.

Under these instructions, the jury, as before stated, found a verdict for defendant, and there was judgment accordingly, from which the plaintiff has appealed to this court, and now insists that the trial court erred in giving for the defendant, the foregoing instructions No. 6. and 7. Among other objections, appellant insists: 1st, That each of said instructions, by necessary implication, assumes that defendant, at and before the date of the sale and lease, in question, was in the actual possession of said premises; which, it is contended, was one of the controverted facts, that should have been submitted, and left to the jury for their determination. 2d, That, under the evidence in this cause, the remaining or continuing in possession, under claim of title, by defendant thereafter, for the statutory period in question without more, was not sufficient to confer title by limitation, unless it also appeared that a knowledge of that fact was in some way brought home to the plaintiff, and that thereafter and prior to the institution of this suit he so remained or continued for the statutory period in question, and that said instructions should have so told the jury.

Under the authorities these objections we think, are well taken. It has repeatedly been so held by this court; and the adjudications elsewhere, as well as text writers, are

to the same effect. *Peck v. Ritchey*, 66 Mo. 114; *Wash. Mut. Fire Ins. Co. v. St. Mary's Seminary*, 52 Mo. 480; *Merritt et al. v. Given et al.*, 34 Mo. 98; *Thompson v. Botts*, 8 Mo. 710; *Hamilton v. Boggess*, 63 Mo. 234; Tyler on Eject. & Adv. Poss., 876; *Skinner v. Stouse*, 4 Mo. 93; *Rice v. Bunce*, 49 Mo. 231; Tyler on Eject. & Adv. Poss., pp. 74, 166, 836, 874, 877.

The theory of defendant's instructions concedes the correctness of the instructions given for the plaintiff, but attempts to escape their force and effect by claiming that, while the defendant may be estopped from setting up the possession and ownership he may have had at and prior to said sale and lease, yet that it is competent for him, under the statute of limitation, to set up and rely upon a possession and ownership acquired or obtained, subsequent to that date, and held by him adversely under claim of title, for the statutory period in question, after such acquisition and prior to the institution of this suit. This it is conceded he may do. But, it is denied that defendant's instructions above given, properly construed, contemplate or submit that question to the jury. On the other hand, the jury, in effect, are told by these instructions that the remaining or continuing in possession, by defendant, under claim of title, for the statutory period, from and after said sale and lease, was of itself sufficient to defeat the plaintiff's recovery, although the jury might believe the facts, predicated in the instructions given for the plaintiff.

This, we think, was not a correct presentation of the law, applicable to the facts of this case, as disclosed by the record. For such purpose there is a material and manifest distinction, between the acquisition of an original or new possession, after the date of said sale and lease, and the simple continuance of an old possession, that may have existed prior thereto. Under the facts predicated in plaintiff's instructions, the possession and ownership of the premises, at and prior to said sale and lease, as against this defendant, were indisputably with Silas Thompson, the son ot defend-

ant, and that possession and ownership as against this defendant, by operation of law, was indisputably transferred to the plaintiff, *eo instanti*, by the making of the sale and lease in question. Whatever possession or ownership, if any, the defendant may have had, at and prior thereto, or may have remained or continued with him thereafter, under the facts of this case, was in legal contemplation,. subordinate and not hostile to the possession and ownership so acquired and held by plaintiff, and could not, under the statute of limitation, be successfully converted into an adverse holding, until a knowledge of this change from a. friendly to adverse holding, was, in some way, brought home to the plaintiff, and continued thereafter for the requisite statutory period; and the burden of showing such change and knowledge rests on the defendant. Such, we think, is the well settled law in such cases. To this effect. are the authorities cited, *supra*.

These views are altogether ignored in defendant's said instructions, and in these particulars they are erroneous and misleading. For these reasons, the judgment of the trial court is reversed and the cause remanded for further trial. All concur, except HOUGH, C. J., absent.