ROANOKE INVESTMENT COMPANY v. THE KANSAS CITY & SOUTHEASTERN RAILWAY COMPANY, Appellant.

DIVISION TWO.

1. **Railroad**: RIGHT OF WAY, ABANDONMENT OF. The mere non-user of a right of way granted to a railroad company will not extinguish the easement, in the absence of adverse possession by the servient owner, or of such acts on the part of the company as evince a clear intention to abandon the right of way.

2. ————: ————: CONDITION SUBSEQUENT. A grantor of a right of way to a railroad, the deed having been lost, testified that the company by the terms of the deed was to build, immediately after the road was finished, two double-track bridges across the cut on the grantor's land. *Held*, that the part of the contract relating to the bridges was not a condition subsequent, failure to perform which would forfeit the grant.

3. **Conditions Subsequent**. Conditions subsequent are not favored in the law but are construed strictly because they tend to destroy estates.

4. **Easement**: ABANDONMENT OF. While mere *non-user* of an easement will not constitute an abandonment, yet if acts are shown of such unequivocal nature as to show a clear intention to abandon, abandonment will be inferred.

5. **Railroad**: RIGHT OF WAY : ABANDONMENT OF. The evidence in this case *held* sufficient to show abandonment by the defendant railroad of the right of way in question.

sexton

*Appeal from Jackson Circuit Court.*—HON. T. A. GILL, Judge.

AFFIRMED.

*Johnson & Lucas* and *C. O. Tichenor* for appellants.

( 1 ) If an easement is visible, purchaser takes subject to it. *Zell v. Universalist Soc.*, 119 Pa. 402. The right of way in controversy was either fill or cut. The work had been completed. Plaintiff gave nothing for the strip; knew of it, recognized it and contracted in reference to it. It seeks to contest defendant company's right in it, not at law, but by an injunction. This cannot be done. *Smith v. Jameson*, 91 Mo. 13; *Railroad v. Maddox*, 92 Mo. 469. (2) Plaintiff claims by adverse possession. The finding is against it. The possession of McGee was only partial at best. He gives a variety of reasons for doing as he did. He actually fenced a part while the work was going on. He did as others, simply to protect the rest of the tract. The company had no notice that this possession was adverse or hostile, even if he so intended, which is doubtful. It is well settled that possession continued after a sale will be deemed subordinate and friendly, until knowledge to the contrary is brought home to the purchaser. *Wilkinson v. Thompson*, 82 Mo. 317 ; *Gordon v. Eans*, 97 Mo. 603. ( 3 ) The court found that this portion of the roadbed had been abandoned, and for this reason made the injunction perpetual. During the life of the first company all of its acts looked to a speedy completion of the road. Its career was ended by bankrupt proceedings. The various and varied conveyances of this roadbed, extending through years, show no intent

to abandon, but the contrary. The right to use land forever does not differ much from the rights given by a fee-simple title. At any rate it is an interest in land. The authorities make a distinction between an easement by mere user and one existing by deed. The first may be lost by failure to use for a long time. To extinguish the latter there must be something more than non-user. This must be coupled with an adverse user by the owner of the servient estate for such a length of time as will vest title. *Welsh v. Taylor*, 50 Hun, 144, and cases cited; *Curran v. City*, 83 Ky. 632; Washburn on Easements [4 Ed.] p. 717, and cases cited in note, also p. 722; *Chandler v. Jamaica, etc.*, 125 Mass. 549. No damage is claimed because of delay in building the road. The road completed would seem to be no benefit else an injunction would not be asked. Where an explanation for the delay can be demanded, one is allowed, and financial inability seems to be one. *Curran v. City*, 83 Ky. 628. (4) It is said that one Martin and the engineer of defendant's company told some people that the grade of the roadbed was impracticable, and that, therefore, the road could not be built by this route. What relation Martin bore to the company, the evidence does not disclose. Some thought him a director, some the treasurer; at any rate Martin's talk was based upon the engineer's opinion. In other words, it seems to have been thought that a treasurer or director by conversation can abandon, not simply a right of way, but also work thereon, compared with the cost of which, that of the right of way is insignificant. (5) The conveyances through which defendant company claims passed the title to the old grade, whether it was in its route or not. The state alone can question their validity. Morawetz on Corp., secs. 707, 710, note 1; Pierce on Railroads, p. 507, notes 3 and 4, and pp. 519, 520, and note 521; *Land v. Coffman*, 50 Mo. 243; *Shewalter v. Pirner*, 55 Mo. 218; *Drug Co. v. Robinson*, 81 Mo. 18; *Hovelmann v. Railroad*, 79 Mo. 632.

*Dobson, McCune & Doggett* and *Trimble & Braley* for respondent.

( 1 )  The plaintiff paid at least $28,755 for the strip of land.  It held the actual possession thereof under claim of title.   It held a position which for many years had been adverse.   It held the record title, and claimed in good faith to be the owner in fee simple.   The defendant purchased its alleged title with knowledge that the land was being held adversely and paid therefor at the rate of about nine cents a mile.   Plaintiff knew of defendant's claim but did not recognize it. The defendant had never been in possession but attempted to take possession away from plaintiff, and to take the land against plaintiff's objection, by force, and build a railway on it.   Equity can and should restrain such acts, at least not until the defendant had established its right to the land by a suit at law. *Eichelkamp v. Schrader*, 45 Mo. 505 ; *Lockwood v. Lumsford*, 56 Mo. 68 ; *Smith v. Jameson*, 91 Mo. 13 ; *Landis v. Bettle*, 3 L. J. Ch. 451 ; *Railroad v. Railroad*, 69 Mo. 71 ; *Bank v. Kercheval*, 65 Mo. 688 ; *McPike v. West*, 71 Mo. 199.   ( 2 )  The case must be tried here upon the same theory that the defendant had it tried in the court below.   *Nance v. Metcalfe*, 19 Mo. App. 183 ; *Schlicker v. Gordon*, 19 Mo. App. 479 ; *Corn v. Cameron*, 19 Mo. App. 573 ; *Fell v. Mining Co.*, 23 Mo. App. 216 ; *Whetstone v. Shaw*, 70 Mo. 575.   ( 3 )  The right of way has been lost by abandonment.   An easement may be abandoned by intent or estoppel.   The intent may be proved by declaration or may be inferred from acts or omissions.   If an intention to abandon the easement can be inferred the law declares that it cannot afterward be resumed.   Abandonment will be more readily inferred when the easement was granted for public purposes than when it was created for private use.   The words, acts and omissions of the holders of this easement all show  clearly  an  intention to abandon it ; and the

intent to abandon, *ipso facto*, extinguished the claim. *Rhodes v. Whitehead*, 27 Texas, 310, *et seq.*; *Marigny v. Railroad*, 15 La. Ann. 427; *Pratt v. Sweetser*, 68 Me. 344; *Davis v. Butler*, 6 Cal. 510; *McGoon v. Ankeny*, 11 Ill. 558; *Railroad v. Covington*, 2 Bush, (Ky.) 526; *Moore v. Rawson*, 10 Eng. Com. Law Rep. 158, *et seq.*; Wood's Railway Law, sec. 233; Tiedeman on Real. Prop., sec. 605; Washburn on Easements [Last Ed.] pp. 707, 709 and 713. (4) Independent of the question as to whether there was an actual intent to abandon the easement, yet the evidence shows that the Kansas City & Southern Railway Company by its declarations and acts led the fair company to believe that it was abandoned, and permitted the fair company, acting under such belief, to buy the strip and expend large sums of money in improving it for purposes which rendered it worthless for railroad uses without objection. Such conduct works abandonment, and estopped the defendant's grantor from taking the land from the fair company. *Bank v. Nichols*, 64 N. Y. 704; *Corning v. Gould*, 16 Wend. 531; *Taylor v. Hampton*, 4 McCord (S. C.) 96; *Moore v. Rawson*, 10 Eng. Com. Law Rep. 158, *et seq.* (5) The estoppel which prevented the Kansas City & Southern Railway Company from asserting a claim to this easement against the fair company now prevents the defendant from asserting that claim against the plaintiff; for an estoppel which is binding as between the original parties is also binding as between their respective grantees. *Thistle v. Buford*, 50 Mo. 278; *Wood v. Seely*, 32 N. Y. 116; *Shaw v. Beebe*, 35 Vt. 205; *McFarland v. Creath*, 35 Mo. App. 112; Bigelow on Estoppel, 493. (6) The evidence shows that it was one of the conditions of the deed which granted this easement that the grantee should build two bridges across the cut made in the land. This was a condition subsequent, and the failure to perform it gave the grantor the right to enter upon the lands and thereby defeat the estate conveyed by the

deed. The grantor says he did not enter for that reason and for the purpose of defeating the estate. It is undisputed that he took possession, and the law will presume his possession to be for the purpose of defeating such an estate. *Taylor v. Railroad,* 25 Iowa, 371; *Underhill v. Railroad,* 20 Barb. 455; *Railroad v. Neighbors,* 51 Miss. 412.

GANTT, P. J.—This is a civil action to perpetually enjoin the Kansas City & Southeastern Railroad Company from entering, building and operating a railroad through ninety-two and three-tenths acres in the northeast quarter of section 19, township 49, range 33, in Jackson county, Missouri.

The plaintiff is a business corporation organized under the laws of this state, and the defendant is a railroad corporation organized under the laws of this state, also, and its owners.

Plaintiff had laid off the lands into town lots, streets and blocks as an addition to Kansas City. It charges that the defendant is about, wrongfully, illegally and without plaintiff's consent, to enter upon these lands, build and excavate a roadbed for a railroad and appropriate a right of way across said lands, in violation of the constitution and to the irreparable damage of plaintiff.

The answer of the defendant is, *first,* a general denial, and, *second,* that it is the owner and entitled to the possession of a right of way for a railroad through, over and across the lands described in the petition, of the width of one hundred feet, and is the owner and entitled to the possession of a graded roadbed for a railroad, situated on said right of way, and was such owner, and so entitled to the possession of said right of way and graded roadbed at the time of the filing of the petition in this cause and ever since has been.

To this plaintiff replied, *first,* denying defendant was the owner of the right of way; *second,* that plaintiff

and those under whom it claimed had been in the open, notorious, peaceable, continuous and adverse possession of said lands, including right of way for thirteen years next preceding the commencement of this suit; *third*, that defendant and those persons under whom it claimed title to the alleged right of way and roadbed have long since wholly lost right to the possession and use of said right of way and roadbed by abandonment, if *it* or *they* ever had such right.

These facts were developed upon the trial in the circuit court. On the fourteenth day of August, 1871, the Kansas City, Memphis & Mobile Railroad Company was organized under the laws of this state. At that time and for many years previous thereto and until the year 1873, A. B. H. McGee was the owner of the ninety-two-acre tract of land described in the petition. In 1873 McGee conveyed by deed to Kansas City, Memphis & Mobile Railroad Company the right of way through the lands in question. That conveyance was never recorded and appears to have been lost, but McGee is positive that he delivered such a deed. When shown another deed to other lands by himself and wife to the same company for a right of way, he testified, "They were worded the same, because the same man wrote them both, I think." The deed shown him was the ordinary form of "Grant, bargain and sell" with a limitation in the habendum clause as follows: "Unto said party of the second part ( *the defendant herein* ) and its assigns forever ( meaning thereby ) so long as the said land hereby conveyed shall be used for railroad purposes."

McGee testified that the railroad company paid him $5,000 in money, and agreed to build him two bridges over the cut made by the road through his land. The deed was executed and delivered about the month of October, 1873.

The road ran about three-fourths of a mile through this land. The cut was thirty feet deep a portion of

the way, and a heavy fill the remainder. McGee testifies
that the road was about half constructed through
his land when he made the deed. He put up fences
inclosing this right of way with his pasture before he
executed the deed. The railroad company expended
about $20,000 on this tract, and completed the roadbed
some time in 1874.

On the fourth of February, 1876, the railroad com-
pany was adjudged a bankrupt and Turner A. Gill,
Gardiner Lathrop and Henry Flannagan were duly
elected and confirmed assignees. Under an order and
judgment the United States district court for the western
district of Missouri, the bed, masonry, right of way and
appurtenances of said railroad were sold by said
assignees to John D. Bancroft, for $15,025, and a deed
duly executed April 25, 1877. It appears that the
county of Jackson had subscribed and paid to said com-
pany $300,000, and the merchants of Kansas City were
greatly interested in the building of the road. Accord-
ingly, April 2, 1877, Bancroft made a deed to Thomas
K. Hanna, Benjamin McLean and John D. Bancroft, in
trust for themselves and their associates, business and
professional men of Kansas City. January 13, 1880,
Hanna, McLean and Bancroft in execution of their trust
conveyed to James I. Brooks all of said property. On
the twenty-seventh of February, 1880, Brooks conveyed
all the property he had thus acquired to the Kansas
City & Southern Construction Company.

On the tenth of June, 1880, the Kansas City &
Southern Railway Company was organized and received
its certificate of incorporation from the state of Mis-
souri. On the eighteenth of September, 1880, the Kan-
sas City & Southern Construction Company conveyed
all of the roadbed, franchises, etc., to the Kansas City
& Southern Railway Company, and on the fifteenth day
of December, Hanna, McLean and Bancroft also remised,
released and quitclaimed to the last-named railroad all
the rights they held for themselves and their associates.

During the period of bankruptcy the various owners of this railroad and right of way were unable to finish their road, and all work was stopped.

On May 25, 1882, McGee conveyed the ninety-two-acre tract to the Kansas City Inter-State Fair for $425 per acre. The fair company took possession of the whole tract including the right of way involved in this action, constructed a racetrack across this right of way in two places, built stables, amphitheater and other improvements.

William R. Bernard testified he was one of the judges of the county court of Jackson county and knew that Jackson county spent $300,000 on that grade; that it was completed October 27, 1874. He also testified that he knew of McGee fencing this tract. He was also a director and superintendent of the fair association. In its behalf he took possession after McGee deeded them the tract. He knew McGee had received the purchase money for this land prior to the fair association buying and taking possession, and knew McGee had conveyed it from conversations with McGee. On July 2, 1887, the Kansas City Inter-State Fair conveyed the ninety-two and three-tenths acres to the Roanoke Investment Company. The deed so made contains this clause: "The east thirty (30) feet of land off the east side of the tract herein described, being conveyed subject to the rights of the public therein for highway purposes, excepting from the covenants expressed and implied herein the right of way through said land for railway purposes, if any such exist, of the Kansas City, Memphis & Mobile Railroad Company and those claiming through or under it."

Mr. A. A. Whipple, who was the promoter of the scheme to organize the plaintiff corporation, and, it seems, the general manager of its affairs after organized, testified that he had been familiar with the cut through McGee's land for at least thirteen years. After his company bought he had a conversation with John I.

Blair, who was the chief owner of the Kansas City & Southeastern railway. Blair told him he was going to utilize the right of way, and Whipple says, "We had some kind of agreement for a while."

This witness produced the contract between the fair association and S. T. Whipple & Co., agents for a corporation thereafter to be formed, and afterwards the plaintiff herein. This contract was for the one hundred and twenty-eight acres (including the ninety-two and three-tenths sold to the fair by McGee) "less five acres, the right of way of the railroad through the same known as the 'Blair right of way,' which is to be conveyed by sellers to buyers by *quitclaim at a nominal consideration.*" These words, the bill of exceptions recites, had a pencil mark drawn through them. In explanation of this clause, Mr. Whipple testified: "They made us a six-acre reduction." On re-examination by his counsel, he said: "We bought the right of way and supposed we had a good title. *We knew that McGee had made a deed to it.* The capital stock of the Roanoke Investment Company is $500,000. We, my brother and I, own $500 less than one-half of the whole. We knew the railroad company was claiming the right of way. We knew they were going to try to get it if they could."

The evidence also showed that the fair association, during its occupancy of the ninety-two acres, built a racetrack across the right of way at two places, and McGee rolled some large stones back into the cut prior to selling the land to the fair association.

The circuit court rendered the following decree: "The court being fully advised in the premises doth find all and singular the facts stated in plaintiff's petition to be true as therein alleged, except as to the adverse possession therein claimed, which said adverse possession the court finds only began in the early part of the year A. D. 1882, and has continued in the manner charged until this date, and plaintiff is now in the

enjoyment of such possession, and doth further find that the right of way for a railroad and roadbed, claimed by the defendant, Kansas City & Southeastern Railroad Company, in its answer, was created and granted by deed of one McGee in A. D. 1871, who was then the owner of the lands described in the petition; that said deed created and granted a mere easement over said lands to be used for the purpose of a railroad; that plaintiff has not acquired the title to said strip of land by adverse possession of itself and those under whom it claims; but that, long prior to the institution of this suit, said easement had been abandoned and all right to use the same for a railroad had thereby been lost and extinguished. It is, therefore, by the court considered, ordered, adjudged and decreed that the temporary restraining order, heretofore granted in this cause, be made perpetual and that defendants and each of them, their respective servants, agents and employes be, and they are and each of them is hereby, perpetually enjoined and restrained from in any manner attempting to excavate, grade or construct a roadbed for a railroad and from attempting to build, construct or operate, and from building, constructing or operating a railroad on, over or across the following lands or any part thereof until they have acquired the right to do so in the manner required by law."

From this decree the defendants alone appeal. The issues are clear and well defined. The plaintiff claims the right of way by virtue of deeds from McGee and "The Kansas City Inter-State Fair." Prior to the execution and delivery of these deeds, McGee had already conveyed this right of way to the Kansas City, Memphis & Mobile Railroad Company, and that company had taken possession and excavated the cut and made the fill through this land at a cost of $20,000.

Of the execution of this deed and the construction of this roadbed, both the Kansas City State Fair and the promoters of the plaintiff corporation had actual

and ample notice. Hence, plaintiff's title by deed is subject to the easement acquired by said railroad, as the conveyances to defendant carry all the title acquired by the Kansas City, Memphis & Mobile Railroad Company unless this easement has been lost by some act or acts of the said railroad and its successors. Guarding itself against this view, plaintiff claimed title by adverse possession of the premises in dispute.

The circuit court found very properly there was no adverse possession until 1882, when the fair company fenced the right of way and took possession. As the proceeding was instituted November 2, 1887, only five years after such possession was shown, of course, plaintiff failed on this claim. *Wilkerson v. Thompson*, 82 Mo. 317 ; *Gordon v. Eans*, 97 Mo. 603.

This brings us to the real point in the case. The circuit court found that defendant and those through whom it claims in 1871 acquired an easement over these lands to be used as a right of way for a railroad ; that this easement was created and granted by deed from McGee, the then owner ; *that this easement had been abandoned by those under whom defendants claimed*, and was consequently extinguished. As this is a strictly equitable proceeding, we are required to examine the evidence to determine whether the circuit court properly found this fact.

The facts upon which plaintiff relies to show an abandonment of this easement are as follows : *First.* There was a non-user from 1874 to 1887. Now, it is clear that, after completing this cut and other costly work in the immediate neighborhood, the railroad company was declared a bankrupt, and no track was laid or trains run over this road until just previous to the commencement of this suit, when the defendant having laid its track on the roadbed some five miles south of this tract was preparing to complete it into the city. It is equally clear that no one else had occupied or used this right of way in any manner until the "Kansas City

Inter-State Fair built its racetrack across it in two places. So that as to this immediate part of the railroad, we have a non-user by the company or owners for thirteen years; and an actual use by the owner of the lands through which it ran, by building and using the two tracks across it, from 1882 to 1887. Does such a non-user of itself work such an abandonment as will forfeit the right?

In the decision of this question, it is essential to remark that the courts in England and in the different states of the Union have almost invariably made a distinction between easements acquired by deed and those acquired by prescription. It is generally held that, "if the easement has been acquired by deed, no length of time of mere non-user will operate to impair or defeat the right. Nothing short of a use by the owner of the premises over which it was granted, which is adverse to the enjoyment of such easement by the owner thereof, for the space of time long enough to create a prescriptive right will destroy the right granted." Washburn on Eas. & Serv. [3 Ed.] ch. 5, sec. 6, pp. 670, 671, and cases cited, pp. 551, 552; *Curran v. Louisville*, 83 Ky. 628; *Chandler v. Aqueduct*, 125 Mass. 549; *Welsh v. Taylor*, 50 Hun, 144, and cases cited.

Whether the distinction between easements acquired by grant, and those acquired by user alone, should be made, it is unnecessary to decide; we hold that the mere non-user of this piece of road, in the absence of adverse possession by the servient owner, or other acts of such unequivocal nature on the part of the owners of the railroad as evinced a clear intention to abandon the easement, would not work an extinguishment of the right, however acquired.

*Second.* It is next insisted, that as McGee testified that the Kansas City, Memphis & Mobile Railroad Company agreed that in addition to the $5,000 it paid him for the right of way it would build him two bridges, and as neither said railroad nor any one of its successors

have built said· bridges that the non-fulfillment of this agreement would defeat the estate, and the fact, that defendants and those under whom they claim failed to do what was necessary to prevent the estate reverting, tends to show an intention to abandon.

McGee testified as to these bridges : "They were to build a double-track bridge; that was part of the contract.  *  *  *  This I considered a contract, and they were to build two double-track bridges across that cut, one in the deepest place and one where the county road strikes it. * * * That was the words of the contract. * * * It was a part of the contract that they were to build these bridges immediately after the roadbed was finished, so they could put them in."

According to this, these bridges were not to be built until the work was finished. All that can be definitely ascertained about these bridges from this is that they were to be double-track bridges and located across the cut, one at the deepest place, the other where the county road crossed. Was this portion of the contract such a condition as its breach would forfeit the estate? Conditions subsequent are not favored in law and are construed strictly, because they tend to destroy estates. Coke, Littleton, 205 b, 219 b. · "If it be doubtful whether a clause in a deed be a covenant or a condition the courts will incline against the latter construction ; for a covenant is far preferable." 4 Kent's Com. 132. The usual words in a condition subsequent are "so that," "provided," the latter according to Lord Coke being the most appropriate.

Applying this rule to this case; none of the usual words of a condition are found, nor is there in McGee's evidence anything that would support the view that he ever told the officers of the railroad that a failure to build these bridges would forfeit the grant for which they had paid him $5,000. Such a construction is contrary to "good sense and sound equity." We hold these words did not create a condition subsequent in

law, and a mere failure to build these bridges would not cause a reverting of this estate. *Chapin v. School Dist.*, 35 N. H. 445.

· But while it is true, that mere non-user will not amount to an abandonment, it is well settled that an easement acquired by grant or its equivalent may be lost by abandonment. To constitute an abandonment of an easement acquired by grant, acts must be shown of such an unequivocal nature as to indicate a clear intention to abandon. *Curran v. Louisville, supra; Dyer v. Sanford,* 9 Metc. 395; *Hayford v. Spokesfield,* 100 Mass. 491. It is said, however, that abandonment will be more readily inferred when the easement was granted for public purposes than when it was created for private use.

The easement acquired by McGee was for a public use, a highway. This right of way was acquired by a railroad company, authorized by its charter to run a railroad from Kansas City in Jackson county, southeasterly through Cass, Henry, St. Clair and Greene to the southern boundary of Missouri. After acquiring this right of way, the roadbed was excavated and the grade established; no track was ever laid upon it. In 1874 the company was declared and adjudged bankrupt. The roadbed and property was all sold to a number of merchants and professional gentlemen of Kansas City, and a deed was made to Messrs. T. K. Hanna, McLean and Bancroft, as trustees, for the party who had made the purchase. These gentlemen being greatly interested in the welfare of Kansas City were anxious to establish a railroad to the southeast, to open the markets of the south to her merchants. They made several efforts which failed. Finally, in December, 1880, they made a deed of release to the Kansas City & Southern Railway Company. E. L. Martin of Kansas City was named as one of the directors of the Kansas City & Southern. The contract of the trustees, Hanna, McLean and Bancroft, with this last-named railroad

provided for the expenditure of "$25,000 on the estimates and orders made and given in the building of *such railroad*, by the chief engineer of said company" before July 1, 1881, and upon the expenditure of that sum and $15,000 more, before October 1, 1881, then the trustees were to release all claims to the road to said company.

The evidence is conclusive that when this new company began to work on the road, intead of utilizing this old right of way it adopted a new route, procured a new right of way and constructed a railroad from Kansas City to Clinton, Missouri. No use whatever was made of the right of way through McGee's lands. Under these circumstances, McGee sold the whole tract to the Kansas City Inter-State Fair for a fair ground and race course. The fair expended $115,000 to $120,000 in improvements on these grounds. Among other things was the erection and construction of a racetrack which brought within its limits a portion of the railroad excavation, crossing at the south and again near the north end making two crossings of the right of way, and including about nine to eleven hundred feet of the railroad within the limits of the racetrack. The fair association occupied these lands and maintained these obstructions across this right of way until 1887. Mr. Payne and Judge Bernard both testified that, while these improvements were being constructed, no one for the railroad made any objection or adverse claim to the premises.

They held five fairs on the ground, and then sold to the plaintiff. When the Kansas City & Southern began to build, the citizens of Westport, learning that the company was constructing its road by way of the east bottoms and the Blue river, held a meeting. It was then understood that the Kansas City & Southern Company were going to abandon the route through this land and Westport and build through the east bottoms.

This meeting appointed Judge Cowan, George N. Nolan and Judge Bernard to confer with the company and induce it not to abandon the old route. This committee "met the company in Kansas City, where it had headquarters, and offered all the inducements it could to have the company adopt the Westport route. The chief engineer was called. He took the profile and endeavored to show the committee that the Westport route was impracticable, and finally told them they couldn't do it. The grade was too heavy."

The *intention* to abandon that route was clear at that time. But the intention to abandon was not allowed to rest upon the declarations of the officers. The company went to work and graded its road into Kansas City over a different route, as it had declared it would do. It would be very hard to conceive of more positive, unequivocal evidence of an *intention* to do an act than concurred in this case.

But the evidence of abandonment does not rest upon the non-user for thirteen years, the actual diversion of the road from this route, upon the clearly expressed intention to abandon, and standing by five or six years while the fair company was expending immense sums of money in improvements upon this land and actually filling up the cut, without protest; in addition to all this the company signalizes its final abandonment by conveying the eleven miles of road including the land in question to another corporation organized to operate a railroad eleven miles in length, a purpose not contemplated by either grantor or grantee when the right of way was granted.

We think when this was done, the intention to abandon and the absolute abandonment was consummated, the easement was lost, and the lands in question became discharged of this burden. Acts so decisive and conclusive in character as these have but one meaning; they indicate and prove a clear intention to abandon the right of way. *Moore v. Rawson*, 3 Barn.

& Cress. 332; *Liggins v. Inge*, 7 Bing. 682; *Railroad v. Covington*, 2 Bush (Ky.) 526.

It is not the policy of the law to permit a railroad to acquire a right of way, to build a railroad, to do some work on it, and then, after changing its route and abandoning its easement, still claim and exercise the right to sell the right of way to another. The statute permitting it to acquire land limits it for its own corporate purposes. It is not allowed to enter the market and speculate in real estate in this manner.

When it ceases to use the land for the legitimate purposes indicated in its charter, the lands revert to their owner. Our conclusion is that the circuit court had abundant evidence to sustain its finding, and it becomes unnecessary to discuss the other propositions in the very elaborate and satisfactory briefs, filed by counsel on both sides. Judgment of the circuit court is affirmed. All concur.