EMILY CHAMBERS v. GREAT NORTHERN POWER COMPANY and Others.[1]

March 1, 1907.

Nos. 14,951—(143).

**Eminent Domain—Abandonment of Railroad.**

The title acquired to lands in condemnation proceedings for right of way purposes by the Lake Superior & Mississippi Railroad Company under its charter (chapter 93, Laws 1857, and amendments) was in the nature of an easement or terminable fee, and the lands revert to the original owner

[1] Reported in 110 N. W. 1128.

when abandonèd by the railway company for the purposes acquired, viz., the maintenance and operation of a railroad.

**What Constitutes Abandonment.**

Under a charter which authorizes a railroad company to acquire by condemnation proceedings a strip of land two hundred feet in width over private property for a right of way, for the purpose of maintaining and operating a railroad thereon, the company abandons the right of way by failing to operate trains thereon for a period of ten years, and by removing the track and bridges, and by constructing and operating a new line to accomplish the same purposes.

**Proof of Intention.**

The trial court was justified in holding that the nonremoval of certain stone abutments, and the leasing, for a consideration, the right to maintain telegraph and telephone poles, were not sufficient to establish an intention not to abandon the right of way for the purposes of maintaining and operating a railroad.

Action in the district court for St. Louis county to restrain defendants from entering upon certain land and constructing or operating a railroad thereon. The case was tried upon an agreed statement of facts before Dibell, J., who ordered judgment in favor of plaintiff. From an order denying a motion for a new trial, defendants appealed. Affirmed.

*Washburn, Bailey & Mitchell,* for appellants.

*M. H. McMahon* and *Warner E. Whipple,* for respondent.

LEWIS, J.

In 1869 the Lake Superior & Mississippi Railroad Company acquired title by condemnation proceedings to a strip of land two hundred feet in width across respondent's premises, located in St. Louis county between the villages of Thomson and Fond du Lac. During 1870 the railroad track was constructed on the land so acquired and continuously operated by such company until 1877, when the St. Paul & Duluth Railroad Company became its legal successor. The St. Paul & Duluth Company continuously operated that railroad as a part of its general system until 1887, during which year it caused to be constructed a short line, so called, from Thomson to the village of West Duluth, and that portion of the old line between Thomson and Fond du Lac ceased to be operated after that time, but that part of the old

line between Fond du Lac and West Duluth was kept in operation. In 1900 the Northern Pacific Railway Company succeeded to all the rights and interests of the St. Paul & Duluth Company, and continued to operate the portion of the old line between Fond du Lac and West Duluth, and the new line from Thomson to West Duluth, as a part of its general system.

The track remained upon the right of way between Fond du Lac and Thomson, including that portion across respondent's premises, until 1897, when it was wholly removed, and in 1904 the Northern Pacific Company sold all the wooden bridges on that part of the line, and shortly thereafter they were removed. During the time the St. Paul & Duluth Company operated that part of the road it entered into a contract with the North American Telegraph Company for leasing the right to occupy a portion of the right of way with a line of telegraph poles and wires, in consideration of a stipulated rental and the transmission by the telegraph company of the messages of the railroad company. The contract remained in force until the month of December, 1904, when the telegraph company removed its wires from the poles, but continued to pay the stipulated rental until May, 1905, at which time the Great Northern Power Company, one of the defendants, purchased the poles from the telegraph company and caused the line of telephone wires to be strung thereon, and has paid the Northern Pacific Company a stipulated rental for the right to occupy the right of way with such poles.

The Lake Superior & Mississippi Company, and its successor, the St. Paul & Duluth Company, erected and maintained certain stone abutments for the support of its railroad tracks along the river bank, thus incurring an expense of $20,000, which improvements were never removed from the right of way. No other use than as above mentioned was made of the right of way by any of the companies mentioned, and neither respondent nor her predecessor in title has ever at any time taken possession of the strip of land in question. The Great Northern Power Company claims the right of possession to the land in question under and by virtue of a contract with the Northern Pacific Company to operate a railroad upon the right of way for the purpose of carrying on its business near Fond du Lac.

This action was brought for the purpose of enjoining several defendants from reconstructing a railway track across the premises in question and from operating the same. The facts were conceded as above stated, and the trial court found that the title acquired by the Lake Superior & Mississippi Railroad Company through the condemnation proceedings was in the nature of an easement, and that its successors in interest had abandoned the same by failing to maintain and operate a railroad upon that part of the line between Fond du Lac and Thomson.

1. The first inquiry is the nature of the title acquired by the railroad company in the condemnation proceedings. The original charter was granted to the Nebraska & Lake Superior Railroad Company under territorial act (chapter 93, p. 323, Laws 1857), with authority to construct and maintain a railroad between certain points.

By section 8 of that act

> The said company shall have the right of way upon, and may appropriate to its own use and control for the purposes of the said road and its appurtenances, land not exceeding two hundred feet in width throughout its entire length. * * * All such lands within the limits of the line of said railroad and which may now belong to this territory, or hereafter may be acquired thereby, or by the state in which said line may be, are hereby granted to the said corporation for such purposes to be by them held and possessed so long as the same shall be used for such purposes. * * *
>
> Sec. 9. The said corporation may take and hold for the said purposes, or any of them, such additional lands as may be requisite or convenient therefor, but unless such lands shall be purchased of, or voluntarily given by the owners thereof, full and proper compensation therefor shall be made by said corporation to the owner or owners thereof which compensation shall be ascertained and determined in the manner following.

Then follow provisions for the ascertainment of damages for land so taken, among which it is declared

> In estimating damages or compensations to be paid to any claimants, the said commissioners shall take into consideration

the benefits to accrue to the claimant by the construction of the said railroad, and allow such benefits by way of a reduction of the damages which such claimant may sustain thereby. * * * Whenever any report of commissioners shall have become final, and whenever any appeal from such report or part of report shall have been finally determined, the said corporation shall, upon the payment to each party interested of the sum determined thereby to be due him or her as a compensation for property taken or deposit the same in court for his or her use, become invested and seized of the title of the lands or real estate for which such payment or deposit shall have been made, and entitled to full, free and perfect use and occupation of the same for the purpose aforesaid.

By section 1, c. 1, p. 201, Sp. Laws 1861, the charter was amended by changing the name of the company to the Lake Superior & Mississippi Railroad Company, and practically the same language above quoted with respect to right of way over state lands was re-enacted, and the provision for condemnation of other lands was somewhat enlarged, including the following: "The said corporation may take and hold for the said purposes, or any of them, such additional lands as may be requisite or convenient therefor," etc. By chapter 8, p. 13, Sp. Laws 1868, and chapter 57, p. 250, Sp. Laws 1869, the provisions with reference to acquiring title by condemnation were again somewhat modified, but no material change was made in the language above quoted.

Mr. Cooley states (Con. Lim. [7th Ed.] 762): "There is no rule more familiar or better settled than this: That grants of corporate power, being in derogation of common right, are to be strictly construed and this is especially the case where the power claimed is a delegation of the right of eminent domain, one of the highest powers of sovereignty pertaining to the state itself, and interfering most seriously, and often vexatiously, with the ordinary rights of property." This rule was referred to in Fairchild v. City of St. Paul, 46 Minn. 540, 49 N. W. 325. See, also, Reed v. Board of Park Commrs. of City of Winona, supra, p. 167, 110 N. W. 1119.

In the former case the city had acquired by condemnation certain

property for street purposes under a charter which read, "In all cases the land taken and condemned in the manner aforesaid shall be vested absolutely in the city of St. Paul in fee simple," and the court held that the title acquired by the city was a qualified or terminable fee for street purposes only, which it held, not as proprietor, but as an agency of the state, in trust for the public for street purposes. The same rule of construction was recognized in Fletcher v. Chicago, St. P., M. & O. Ry. Co., 67 Minn. 339, 69 N. W. 1085.

Appellant calls attention to the cases of Soukup v. Topka, 54 Minn. 66, 55 N. W. 824, and Farnham v. Thompson, 34 Minn. 330, 26 N. W. 9, 57 Am. 59, and suggests that under the doctrine of those cases the words in the charter, "for the purposes aforesaid," should be treated as mere surplusage, having no connection with or bearing upon the preceding language. While the subject bears some analogy to granting clauses in deeds of conveyance, we are not at liberty to discard these words, unless it appears clearly from a consideration of the entire charter that they have no proper relation to the main purpose of the act. The language employed with reference to granting a right of way over state lands clearly imports that a mere easement was granted for so long a time as the land should be occupied and used for the purpose of operating a railroad. No reason occurs to us why any distinction should be made in the nature of the title granted by the state of its own lands and the title to be acquired from private owners. In both cases the lands were required for the purpose of constructing and operating a railroad thereon, and in the absence of express provision to the contrary would revert to the owner when no longer used for the purposes acquired. Conceding that the legislature might have endowed the company with the power to acquire title in fee absolute for such purposes, we are very clear that it failed to do so, either by the original act of 1857 or by any of the subsequent amendments enacted after the adoption of our state constitution. It therefore becomes immaterial whether the title amounted to a mere easement, or a qualified or terminable fee. Whatever the nature of the title, it would terminate whenever the company failed to perform the very function which it was created to perform, viz., operate a railroad over the land. Kellogg v. Malin, 50 Mo. 496, 11 Am. 426; Quimby v. Vermont, 23 Vt. 387; Abercrombie v. Simmons, 71 Kan.

538, 81 Pac. 208, 1 L. R. A. (N. S.) 806; 10 Am. & Eng. Enc. (2d Ed.) 1197.

2. Whether or not an abandonment occurred in this case was a question of fact, primarily to be determined by the trial court, and the court found that the portion of the road originally operated as a part of its main line between Thomson and Fond du Lac ceased to be used as a railroad by the operation of trains thereon after the year 1887; that such nonuser was not for a temporary purpose only, but was with the intention of abandoning that part of the line permanently; and that such purpose finally terminated in its actual abandonment for all railroad purposes.

The following facts seem inconsistent with any other object: The building of another, shorter, and presumably better line to accomplish the same purposes, and the removal of the rails upon the old right of way in the year 1897, followed by the removal of all the bridges on that portion of the line in 1904 or 1905. It does not appear that at that time there were any village or commercial interests on that part of the line between Fond du Lac and Thomson to be served, either immediately or prospectively. From all this the conclusion is irresistible that it was the intention to abandon that portion of the road entirely, for the reason that the same purposes had been otherwise provided for in a more convenient and economical manner.

The only facts which tend to indicate a contrary intention are that the company did not remove certain stone abutments which had been necessary to sustain the railway bed, and for a consideration it had leased the right to maintain a line of telegraph poles. Admitting that the original owner of the fee took no steps to regain actual possession of the right of way during this period of inactivity, whether there was in fact an abandonment of the right of way for the purposes for which it was originally acquired is to be determined as of the date when the company attempted to reassert possession. The public purpose for which the right of way was originally secured under the charter was to maintain and operate a railroad, which means the operation of passenger and freight trains. Of course, incidental to the conduct of such public business the company would have the right to operate a telegraph or telephone line, and to maintain poles upon the right of way; but it never had the authority under its charter to acquire the

right of way for the purpose of leasing the right to maintain the same independent of the operation of a railway. We attach no great importance to the fact that the company left stone abutments in place which cost $20,000, in view of the fact that it took down the bridges, removed the track, and provided another line of railroad to accomplish the same purpose.

While the burden of proof was upon relator to establish facts sufficient to constitute abandonment, and the evidence must be clear upon that point, we think appellant entirely failed to overcome the effect of the evidence referred to, and that the court was justified in finding the right of way had been abandoned. Jones v. Van Bochove, 103 Mich. 98, 61 N. W. 342; Chicago v. Clapp, 201 Ill. 418, 66 N. E. 223; Roanoke v. Kansas City, 108 Mo. 50, 17 S. W. 1000; Proprietors v. Nashua, 104 Mass. 1, 6 Am. 181. The following cases are clearly distinguished: Canton v. Baltimore, 99 Md. 202, 57 Atl. 637; Durfee v. Peoria, 140 Ill. 435, 30 N. E. 686.

Order affirmed.